IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Janet B.,[1]                                            No. 3:23-cv-00339-HZ

                 Plaintiff,                          OPINION & ORDER

      v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                 Defendant.


Scott A. Sell
Thomas, Coon, Newton & Frost
820 SW 2nd Ave, Ste 200
Portland, OR 97204

        Attorney for Plaintiff

Kevin C. Danielson
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Ste 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Sathya Oum
Social Security Administration
Office of the General Counsel
6401 Security Blvd
Baltimore, MD 21235

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Plaintiff Janet B. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits ("DIB"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court affirms the Commissioner's decision.

## PROCEDURAL BACKGROUND

     Plaintiff applied for DIB on January 8, 2020, alleging an onset date of August 15, 2019. Tr. 18.[2] Plaintiff's date last insured ("DLI") is December 31, 2025. Tr. 20. Her application was denied initially and on reconsideration. Tr. 18.

     On September 15, 2021, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 18. On October 14, 2021, the ALJ found Plaintiff not disabled. Tr. 32. The Appeals Council denied review. Tr. 1.

## FACTUAL BACKGROUND

     Plaintiff alleges disability based on postural orthostatic tachycardia syndrome ("POTS"), Ehlers-Danlos syndrome ("EDS"), anxiety, multiple system effects, pelvic relaxation effects, and a connective tissue disorder. Tr. 238. At the time of her alleged onset date, she was 45 years old. Tr. 31. She has at least a high school education and past relevant work experience as a speech and language pathologist. Tr. 30-31.

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 9.

**SEQUENTIAL DISABILITY EVALUATION**

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to

the Commissioner. In step five, the Commissioner must establish that the claimant can perform

other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f). If the

Commissioner meets their burden and proves that the claimant can perform other work that

exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566,

416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity after her alleged onset date. Tr. 20. Next, at steps two and three, the ALJ determined that

Plaintiff has the following severe impairments: "postural orthostatic tachycardia syndrome

(POTS), Ehler-Danlos syndrome (EDS), and left foot hallux valgus." Tr. 21. However, the ALJ

determined that Plaintiff's impairments did not meet or medically equal the severity of a listed

impairment. Tr. 22. At step four, the ALJ concluded that Plaintiff has the residual functional

capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) with the following

limitations:

> [S]he can lift up to 10 pounds occasionally; never climb ladders, ropes, or scaffolds;
> frequently climb ramps or stairs; frequently balance; frequently stoop, crouch,
> kneel, and crawl; avoid concentrated use of hazardous, moving machinery; avoid
> all exposure to unprotected heights; and based on physical symptoms, work would
> be limited to simple, routine, and repetitive tasks that can be learned on the job
> within 30 days or less, performed in a work environment free of fast-paced
> production requirements, involving only simple work-related decisions, and with
> few, if any, workplace changes.

Tr. 22. Because of these limitations, the ALJ concluded that Plaintiff could not perform her past

relevant work. Tr. 30-31. But at step five, the ALJ found that there are jobs that exist in

significant numbers in the national economy that Plaintiff can perform, such as "Credit card

clerk," "Ticket counter," and "Final assembler." Tr. 31. Thus, the ALJ concluded that Plaintiff is

not disabled. Tr. 32.

**STANDARD OF REVIEW**

A court may set aside the Commissioner's denial of benefits only when the

Commissioner's findings "are based on legal error or are not supported by substantial evidence

in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal

quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a

whole, including both the evidence that supports and detracts from the Commissioner's decision.

*Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is

susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."

*Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v.*

*Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either

a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal

quotation marks omitted).

**DISCUSSION**

Plaintiff argues that the ALJ erred in rejecting her testimony about her fatigue. Pl. Op. Br.

1, ECF 17. The Court concludes that the ALJ validly discounted Plaintiff's testimony and

therefore affirms the Commissioner's decision.

**I.      Subjective Symptom Testimony**

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL

5180304, at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom

evaluation. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other

grounds). First, the ALJ determines whether there is "objective medical evidence of an

underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal quotations omitted). Second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Id.* (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

Plaintiff worked as a speech and language pathologist from 2006 until she stopped working due to her alleged disability. Tr. 274. She testified that she was down to one student through her contract when the pandemic hit. Tr. 57-58. She tried to go into private practice afterward and had a few students. Tr. 58. The work was only intermittent. Tr. 59. She usually worked no more than half an hour to one hour per week. Tr. 61-62. Plaintiff testified that she also had a booth in an antique mall. Tr. 62. She said that she did not come in consistently. Tr. 62. She needed help lifting anything heavier than five pounds. Tr. 63. Plaintiff testified that the work was "nothing consistent" and was "mostly just to keep from going totally nuts." Tr. 63. She said

she earned around $100 per month from the work. Tr. 63. She stated, "It's just not realistic for me to be standing around selling things anymore." Tr. 64. Plaintiff testified that she could not work a full-time job anymore because of her decrease in function: inability to tolerate lights or flashing, chest pain, and unstable walking. Tr. 70. She stated that her "symptoms can come out of nowhere." Tr. 70.

Plaintiff testified that she had two children, ages 8 and 11 at the time of the hearing. Tr. 48. She testified that she was homeschooling her children, and as of the date of the hearing, it was her second year doing so. Tr. 48. She testified that her children were familiar with her medical conditions and knew that Plaintiff would sometimes need to lie down while teaching them. Tr. 49.

Plaintiff testified that she could pick up groceries unless she had "a really off day." Tr. 50. She testified she could not lift large, full bags. Tr. 50. She could vacuum and do dishes in ways adapted to her conditions. Tr. 50. She could carry food and a small jug of water to feed the family's chickens, and she could feed the family's goats. Tr. 51-52. She could not lift a 20-pound bag of feed. Tr. 52. She did two or three loads of laundry every two days or so, but did not do large loads. Tr. 52-53. She did not carry large amounts of clothing. Tr. 54. Plaintiff testified that she no longer walked the family dog because it was too large to control. Tr. 52.

Plaintiff testified that she did probably ten round trips up and down the stairs each day. Tr. 54. She testified that she usually needed to sit down and relax afterward to see if her heart was pounding. Tr. 54. She did yardwork, but only what she could do while seated. Tr. 55. She could not do it just after she ate. Tr. 55. She did not "go wandering through the grocery store anymore." Tr. 55.

Plaintiff testified that she was taking iron supplements on and off for her iron deficiency. Tr. 64. She testified that she had received over 36 prescriptions from over 24 doctors and lost track of them. Tr. 64. She previously took a beta blocker for her POTS. Tr. 64-65. She stated that "it helped initially" but "became less effective." Tr. 65. She stopped taking it around two years ago. Tr. 65. Plaintiff stated that she sometimes took pain relievers. Tr. 66. She took a mast cell stabilizer occasionally. Tr. 66. She needed to have a lot of salt because she artificially dehydrated. Tr. 66. She also took over-the-counter vitamins. Tr. 67. She took birth control that was prescribed, but she was tapering off because of side effects: headaches, migraines, and chest pain, as well as a stroke risk. Tr. 67. Plaintiff testified that she took Tylenol for migraines or headaches about once a month. Tr. 68-69. She testified that she could get a 72-hour migraine and had recently gotten one. Tr. 69.

Plaintiff testified that she had gone to physical therapy, but "[i]t's not going to fix Ehlers-Danlos." Tr. 71. She testified that the physical therapy did help: "It helps me strategize and protect my joints and my neck and things like that. But it's not curative[.]" Tr. 71. She testified that she was also learning capnography strategies to help with breathing. Tr. 72-73. She believed they were helpful. Tr. 73.

Plaintiff testified that she did not sleep well at night. Tr. 74. She usually got up three to seven times per night. Tr. 74. She woke up so often because her joints would start to hurt because of the Ehlers-Danlos syndrome. Tr. 74. She would have "twingy moments" and her ears would pop. Tr. 74. Plaintiff testified that she did a relaxation program. Tr. 74.

Plaintiff testified that she could take care of her own personal needs, but she did not put things over her head or raise her arms above her chest when dressing. Tr. 74-75. She wore compression hose. Tr. 75.

Plaintiff testified that she had a driver's license and usually could drive, unless she had a flare in her symptoms or a migraine. Tr. 75. She had a flare or migraine about once a month. Tr. 76. She had gone on overnight trips since her alleged onset date, but her husband drove. Tr. 76. Plaintiff went to Canada to visit her mother — a two-day drive. Tr. 76. She stayed for two weeks. Tr. 76. The trip "wasn't too bad." Tr. 77. Her husband bought a 15-passenger van that gave her room to get up and change positions. Tr. 77. Plaintiff testified that she did not go places in the community regularly. Tr. 79.

Plaintiff testified that when sitting, she needed to change positions every five to seven minutes. Tr. 79. She could tolerate standing for about five minutes. Tr. 80. She changed positions or kept moving to avoid issues. Tr. 80. She could walk about an eighth of a mile without needing a rest. Tr. 81. She would need a rest of fifteen minutes to two hours, depending on how she felt. Tr. 82. She got a walker to use if she had to get up in the night, but it was precautionary, not prescribed. Tr. 82. Plaintiff testified that her most comfortable position was "[i]n a pillow castle on my bed." Tr. 82. She testified that she needed to lie down and put her feet up every twenty minutes during the day. Tr. 90-92.

Plaintiff testified that she had trouble using her hands and needed to wear splints on her thumbs. Tr. 83. She could not do things such as pull out a splinter. Tr. 84. Plaintiff testified that she had trouble finishing tasks because of her physical limitations, not a lack of interest or willpower. Tr. 86-87. She testified that she was "losing stamina," and did not think she could work. Tr. 88.

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the

medical evidence and other evidence in the record[.]" Tr. 25. The ALJ discounted Plaintiff's symptom testimony based on her activities, improvement with treatment and adjustments to her medication, failure to consistently abide by treatment, the effects of mold in her house, and the objective medical record. Tr. 25-29.[3] Because Plaintiff challenges only the ALJ's assessment of her testimony about stamina and fatigue, the Court focuses on that testimony.

    A.    Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). There are two grounds for using daily activities to support an adverse credibility determination: (1) when activities meet the threshold for transferable work skills, and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). In order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to reach his or her conclusion on the claimant's credibility. *Id.* at 722-23. In addition, the claimant's ability to perform limited basic daily activities is not a clear and convincing reason to reject a claimant's testimony. *See id.* at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way

---

[3] Defendant also relies on the State agency medical consultants' opinions. Def. Br. 8, ECF 21. The ALJ found their opinions not persuasive. Tr. 30. The Court will not consider their opinions because the ALJ did not rely on them.

detract from [her] credibility as to [her] overall disability. One does not need to be utterly incapacitated in order to be disabled.") (internal quotation omitted).

The ALJ noted that Plaintiff was able to visit her father in Canada when he was ill and to again travel to Canada after he died. Tr. 28. Plaintiff argues that the ALJ did not discount Plaintiff's testimony about fatigue based on this activity. Pl. Reply 13, ECF 22. But the ALJ discussed Plaintiff's travel in addressing Plaintiff's menstrual symptoms, and he addressed her menstrual symptoms in discussing her fatigue. Tr. 28-29. The ALJ specifically addressed the effects of Mircette, Plaintiff's birth control prescription, both times. The ALJ did rely on Plaintiff's travel to discount her testimony.

Reliance on Plaintiff's travel was not error. In July 2019, Plaintiff reported to her naturopath, Dr. Guggenheim that she had recently traveled to Canada, and she "tolerated this very well." Tr. 810. In November 2019, Plaintiff reported to her gynecologist that she visited her father in Canada when he was sick and went back when he died. Tr. 1023. Plaintiff told her naturopath in June 2020 that she had taken three trips to see her father, and that she did not think she would have been able to do so before starting birth control. Tr. 1073. In addition, in July 2021, Plaintiff reported to her gynecologist that she was "currently in Canada helping move her mother from an assisted living location to California." Tr. 1316. The ALJ reasonably concluded that Plaintiff's ability to go on long trips undermined her testimony about the severity of her symptoms, including her stamina. Defendant points to Plaintiff's other activities, including homeschooling her children, doing laundry, caring for animals, performing light gardening, driving, and intermittent work. Def. Br. 7. The ALJ summarized these activities, but it is not apparent that he discounted Plaintiff's testimony based on them. *See* Tr. 23-24.

B.    Course of Treatment

The ALJ discounted Plaintiff's testimony based on the efficacy of treatment, as well as

Plaintiff's noncompliance with treatment and failure to seek treatment. Relevant factors for the

ALJ to consider when evaluating symptom testimony include "[t]he type, dosage, effectiveness,

and side effects of any medication" the plaintiff takes to alleviate symptoms, as well as treatment

besides medication that relieves symptoms, and other measures used to relieve pain or other

symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(vi). "[E]vidence of medical treatment successfully

relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867,

876 (9th Cir. 2017). *See also Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (holding that

the ALJ reasonably discounted the claimant's symptom testimony based on "a gradual

improvement in his functioning with prescribed medication and psychotherapy sessions").

An ALJ may consider a claimant's "unexplained or inadequately explained failure to

seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273,

1284 (9th Cir. 1996). "[I]f a claimant complains about disabling pain but fails to seek treatment,

or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for

finding the complaint unjustified or exaggerated...." *Chaudhry v. Astrue*, 688 F.3d 661, 672 (9th

Cir. 2012) (internal quotations omitted).

In fall 2017, Plaintiff began experiencing an array of symptoms, including chest pain and

dizziness, and was told that she had activity-induced POTS. Tr. 347. In March 2018, she reported

to her provider that she would have sudden onset of increasing fatigue and then feel as though

she was blacking out. Tr. 347. Plaintiff reported another such episode in June 2018. Tr. 375. She

reported that prolonged periods of standing, exertion after meals, and her menstrual cycle

exacerbated these symptoms. Tr. 378. At her hearing, she testified, "I'm losing stamina, and that continues to be a serious issue for me[.]" Tr. 88-89.

The ALJ primarily relied on the efficacy of Plaintiff's treatment in discounting her symptom testimony. The ALJ listed Plaintiff's many treatments:

> Prescribed treatments included cromolyn, iron supplement, continuous oral contraceptive pills, beta blocker, vitamin supplements, increase water and salt intake, physical therapy, and pessary, as well as dietary changes, exercise, diaminoxidase (DAO) with meals, continuous blood glucose monitoring, external vagal nerve stimulator with an alligator clip applied to the tragus, and ice packs applied to the face and neck.

Tr. 25 (citations omitted). The ALJ noted that Plaintiff "required adjustments to prescribed medication regimen and/or doses and additional physical therapy treatments." Tr. 26. He stated, "with the use of most of the prescribed treatments and follow up examinations, the claimant experienced improvements in symptoms, signs, and functioning." Tr. 26. The ALJ also stated: "the clinical records show [Plaintiff's] symptoms increased and reported functioning declined when she was noncompliant with prescribed treatments, and there are no records confirming the claimant utilized some of the recommended treatments, such as the alligator clip and ice packs." Tr. 26 (citations omitted).

The ALJ found that some of Plaintiff's fatigue was a side effect of Macrobid, which was discontinued. Tr. 29. In November 2017, Plaintiff called her provider to report side effects from Macrobid, stating that every time she took it, she had "a long period of fatigue followed by rebound anxiety and a sensation that she has a strong butterfly sensation in her abd." Tr. 984. Her provider told her to discontinue the medication. Tr. 984. Plaintiff argues that this is not a clear and convincing reason to discount her testimony because she continued to report fatigue after November 2017. Pl. Op. Br. 6 (citing Tr. 1069, 1016, 1073). Plaintiff is correct that the record contains evidence of fatigue after November 2017. The ALJ did not err in finding that

discontinuing Macrobid helped decrease Plaintiff's fatigue, but this reason does not on its own constitute substantial evidence to discount her testimony that she was losing stamina.

The ALJ recognized that Plaintiff reported feeling "syncopal-like symptoms/lightheadedness after eating." Tr. 26. At her hearing, Plaintiff testified that she could not do some activities, such as gardening, after she had eaten. Tr. 55. In September 2019, Plaintiff was prescribed cromolyn, a mast cell stabilizer, to treat symptoms of possible allergic or dietetic gastroenteritis and colitis related to eating. Tr. 401. The ALJ noted that Plaintiff did not start taking cromolyn until Dr. Guggenheim encouraged her to do so in June 2020 and wrote her a new prescription. Tr. 26. Dr. Guggenheim wrote in her visit notes that Plaintiff had been prescribed cromolyn but was scared to take it. Tr. 1074. Dr. Guggenheim encouraged her to take it and wrote a new prescription. Tr. 1076. In October 2020, Plaintiff told Dr. Guggenheim that she had been taking cromolyn and found it "mildly helpful." Tr. 1284. Dr. Guggenheim told Plaintiff to take it 20-30 minutes before eating. Tr. 1287. The ALJ correctly stated that "cromolyn provided mild relief in symptoms." Tr. 26.

The ALJ did not err in finding that Plaintiff stopped taking cromolyn because her symptoms improved. The ALJ found that "June 2021 clinical records contradict the claimant's testimony that she continues to take the medication and Dr. Guggenheim's June and October 2020 clinical records reflects a gap in her medication use (considering the prescription allowed only two refills)[.]" Tr. 26. In June 2021, Dr. Guggenheim reported that Plaintiff "has not continued with cromolyn." Tr. 1364. The ALJ also correctly noted that in March 2021, Dr. Guggenheim wrote that Plaintiff reported that she "did not try continuous glucose monitoring because her post-prandial symptoms improved." Tr. 26, 1370. The ALJ reasonably discounted Plaintiff's testimony about her post-prandial symptoms based on her noncompliance with

treatment. Because Plaintiff's post-prandial symptoms are relevant to her fatigue and ability to tolerate activity, this serves to discount her testimony that she was losing stamina.

The ALJ also relied on the efficacy of treatment of Plaintiff's POTS symptoms. Tr. 26. He noted that Plaintiff's POTS was treated with a beta blocker, pindolol, in 2018, but Plaintiff was titrated down at her request. Tr. 26. He noted that in December 2018, Plaintiff was instructed to stop taking the beta blocker except for 1/8 of a dose seven days before the start of her menses. Tr. 26. The ALJ noted that although Plaintiff was instructed to continue taking the beta blocker, she stopped taking it. Tr. 26. And the ALJ found that Plaintiff's stated reasons for discontinuing the beta blocker (worry that it caused low blood pressure and concerns about its interaction with the oral contraceptive) were contradicted by the medical records. Tr. 26-27.

In May 2018, Plaintiff's physician reported that Plaintiff's symptoms from POTS and dysautonomia had improved with pindolol, increased fluids and sodium, and supplements. Tr. 1111. Continued improvement was noted in June 2018. Tr. 858. However, in July 2018, Plaintiff asked to taper off her beta blocker. Tr. 849. She stated that her fatigue was better. Tr. 849. In October 2018, she reported that she was generally stable except during her luteal phase. Tr. 836. She was only taking a low dose of her beta blocker and was exercising more. Tr. 836. She asked to wean off the beta blocker. Tr. 838. She began tapering off that month. Tr. 832. In December 2018, she was down to 1/8 of a tablet of the beta blocker and was "generally tolerating [the tapering] well." Tr. 827. Plaintiff "had an increase in tolerance for standing and walking," and was "able to go for family outings, grocery stores, walking up stairs." Tr. 827. Her provider instructed her to stop taking the beta blocker except for the seven days before her menses, when she was to take 1/8 of a tablet. Tr. 830. However, in November 2019, Dr. Guggenheim noted that Plaintiff was not taking the beta blocker as previously recommended, and recommended

restarting it. Tr. 782. The reason Plaintiff gave for not taking it was that she had not needed it. Tr. 782.

At her hearing, Plaintiff testified that the beta blocker "worked for some time, and then I would always begin to be sensitive to it, reactive to it, and develop side effects from medication." Tr. 64. She also testified that it became less effective over time and lowered her blood pressure. Tr. 65. In September 2019, Dr. Guggenheim noted that Plaintiff had not been taking her beta blocker because she was worried about taking it with birth control. Tr. 787. Dr. Guggenheim recommended taking the beta blocker as needed at the onset of POTS symptoms, which had been worsening. Tr. 786. That same month, a physician told Plaintiff that it was "[f]ine to start low dose Beta blocker as tachycardia could be causing hypotension." Tr. 792. The ALJ reasonably found that Plaintiff's testimony about why she stopped the beta blocker was inconsistent with her stated reason in the treatment records and contrary to medical advice. He also reasonably found that the beta blocker was beneficial.

The ALJ also relied on the efficacy of birth control and Plaintiff's decision to discontinue it. In August 2019, Plaintiff reported "a constellation of symptoms that seem related to luteal phase induced PMDD [premenstrual dysphoric disorder], Dizziness, faigue [sic]. Coupled with severe fatigue and dysmenorrhea unable to get out of bed for 2-3 days." Tr. 1029. Plaintiff reported that syncopal episodes and fatigue were most prominent in her luteal phase and had gotten worse over time. Tr. 1030. She reported that she had to be on medical leave since March because of these symptoms. Tr. 1030. Her gynecologist recommended starting Mircette, a birth control medication, to see if it could mitigate the symptoms. Tr. 1029. In September 2019, Plaintiff told a physician that she was nervous about taking birth control because her mother had

a history of blood clots. Tr. 790. The physician told Plaintiff that the risk was unlikely, and recommended taking birth control. Tr. 792.

In November 2019, Plaintiff's gynecologist recorded that Plaintiff had reported "[v]ast improvement although still symptomatic on Mircette birth control pills[]. Her luteal phase symptoms have improved." Tr. 1022. Plaintiff was doing continuous birth control, and her gynecologist approved. Tr. 1022. Plaintiff reported "[v]astly improved energy" such that she was able to travel to Canada to see her father. Tr. 1023. She reported some remaining POTS and EDS symptoms "but vastly improved in the luteal phase." Tr. 1023. In June 2020, Plaintiff reported to Dr. Guggenheim that she had started taking birth control "and was less anemic and feeling a little better." Tr. 1073. She stated that she did not think she could have taken three trips to Canada without the medication. Tr. 1073. In addition, "[h]er dysautonomia symptoms were less amplified overall" and "her POTS symptoms have improved." Tr. 1073. She still sometimes had low blood pressure and dizziness when it was hot outside, but she believed the symptoms were partially due to hormones. Tr. 1073. Plaintiff did report feeling a sudden need to lay down after pulling weeds, but she felt that her health was better overall from a year ago. Tr. 1073.

In December 2020, Plaintiff went to immediate care for intermittent chest pain. Tr. 1104. The provider recorded that taking birth control, "seemed to make a huge difference for her, decreasing her 'autonomic storms' in number and intensity." Tr. 1105. Plaintiff's pain was mild, around 1 out of 10, at the time of the report. Tr. 1105. In January 2021, Plaintiff's gynecologist again noted "vast improvement on continuous Mircette." Tr. 1253. He noted that Plaintiff's generic had changed and that she was nervous about it. Tr. 1253. Plaintiff's gynecologist wrote that Plaintiff had "[s]ignificant improvement in overall dysmenorrhea, PMDD and quality of life" on birth control. Tr. 1254. Plaintiff reported that the medication had a "significant positive

effect on her ability to maintain some semblance of normalcy." Tr. 1254. Her gynecologist also wrote that Plaintiff's "overall ability to work and fatigue has improved over the last year." Tr. 1254.

In March 2021, Plaintiff reported having a 72-hour migraine after mistakenly taking a six-day break from birth control instead of a four-day break as instructed. Tr. 1329. She did not have to go to the hospital. Tr. 1329. In April 2021, her gynecologist noted that Plaintiff continued to be on a generic for Mircette, and she reported recent possible relational symptoms, but they did not appear to be related to the birth control. Tr. 1320. He recommended that Plaintiff continue to take birth control. Tr. 1320. Plaintiff continued to do well. Tr. 1321. The birth control improved her dysmenorrhea, and her gynecologist noted that "[h]er dysmenorrhea severely affects her EDS and POTS." Tr. 1321.

In July 2021, Plaintiff's gynecologist wrote that Plaintiff was weaning off Mircette. Tr. 1315. Some of Plaintiff's other providers suggested that her side effects were estrogen-related. Tr. 1315. The side effect noted was glare. Tr. 1315. Plaintiff planned to start a progesterone treatment. Tr. 1315. The ALJ correctly noted that Plaintiff provided no optometry or ophthalmology records supporting her statement that the birth control caused glare. Tr. 27. He correctly stated that Plaintiff's gynecologist did not believe Mircette was the cause of Plaintiff's side effects and recommended that she continue the medication. Tr. 27. The ALJ reasonably noted that Plaintiff did much better on birth control and that she chose to discontinue it without having started a replacement. Tr. 28.

The ALJ also relied on Plaintiff's improvement with physical therapy despite inconsistent attendance. He stated, "physical therapy records also documented improvements in energy and functioning, including the fact that she did not need to go to bed early and miss family

activities." Tr. 29 (citations omitted). The ALJ noted that Plaintiff was not consistent in attending physical therapy. Tr. 28-29. Plaintiff argues that the ALJ erred by failing to identify specific pages from the exhibits to support his findings about physical therapy. Pl. Op. Br. 8. She argues that the ALJ's findings are general findings. *Id.* This argument misses the mark. The ALJ made specific findings about when Plaintiff started and stopped treatment, how many sessions she attended, and how the treatment went. Tr. 28-29. While it would have been more helpful for him to cite specific pages of the exhibits, his failure to do so does not render his findings general.

Plaintiff attended physical therapy in 2018, after the onset of her symptoms in fall 2017 and before her alleged onset date of disability. At her eighth visit, in November 2018, she reported that she felt her POTS was resolved. Tr. 619. She was going to the gym and progressing well in her goals. Tr. 619. At her eleventh visit, in December 2018, she reported that she had a bad couple of weeks and had not gone to the gym. Tr. 641. Her symptoms were worse before her period started. Tr. 641. Overall, however, she was more active and well. Tr. 642. Plaintiff exhausted her benefits in December 2018. Tr. 750.

In January 2019, Plaintiff's insurance authorization was extended to mid-February 2019. Tr. 764. In March 2019, it was extended through mid-April 2019. Tr. 755. In February 2019, Plaintiff's provider approved her for seven visits. Tr. 505. At a January 2019 session, Plaintiff reported that she had three great days that week. Tr. 674. She had some ups and downs in her symptoms during menstruation but was overall much improved. Tr. 675. In February 2019, Plaintiff reported that she could see her progress. Tr. 654. She stood up to cook and was running a booth at vintage collection. Tr. 654. She was steadily better despite a flare of her POTS. Tr. 655. She was doing nearly all community activities but sometimes overdid them. Tr. 655. She

still could not carry a full bag of groceries. Tr. 659. In March 2019, Plaintiff continued to notice she could do things better and more easily; she understood how deconditioned she was. Tr. 678.

In September 2019, Plaintiff was discharged from physical therapy because she had not returned for further sessions. Tr. 1348. Her functional goals were noted as 75% met and 80% met. Tr. 1348. Days later, she was approved for eleven visits. Tr. 506. She restarted physical therapy, and her physical therapist wrote that Plaintiff had to take six months off due to financial constraints. Tr. 723. Her physical therapist also noted that Plaintiff needed to return to medication and was not happy about it. Tr. 723. At a session in December 2019, Plaintiff reported that her POTS was "definitely improving." Tr. 637. She was upright from dawn until late night on Thanksgiving. Tr. 637. Her physical therapist wrote that Plaintiff was "really progressing." Tr. 638. At the next session, Plaintiff reported that she continued to improve and to increase her activities of daily living. Tr. 640. Her symptoms flared with a big holiday weekend. Tr. 640. Later in the month, she had a setback with the stress from an unexpected family visit. Tr. 647.

In January 2020, Plaintiff reported that she was doing better, but her symptoms were worse when she was menstruating. Tr. 668. She continued to steadily improve and was back to all activities of daily living with mild limits. Tr. 669. The next day, Plaintiff reported she had a good day, and her pain was not too bad. Tr. 665. She did have a flare of shoulder pain in the night. Tr. 666. She did not react with stress that would flare her POTS. Tr. 666. Later in the month, she reported that she had just had her first day of work. Tr. 671. She had an autonomic storm. Tr. 671. Her activities were increasing and she needed to build up her endurance. Tr. 672.

In February 2020, Plaintiff reported that her POTS symptoms were "not bad" overall. Tr. 648. She was doing some walks and more house and yard work. Tr. 648. She reported that she

worked four days as a speech and language pathologist in January and had to rest and recover. Tr. 648. Her physical therapist reported that Plaintiff had returned to around 75% of her community level activities of daily living. Tr. 649. Plaintiff was "much more active." Tr. 649. Later that month, Plaintiff reported working a four-hour day and that it did not go badly. Tr. 651. Her ability to lift and carry improved, and she was "[d]oing more all the time." Tr. 651. Plaintiff reported that she still felt disabled because she had to be mindful to avoid a flare of her symptoms "and cannot fully do her high demand life." Tr. 652. Two weeks later, Plaintiff reported that she had been on her feet all day. Tr. 660. She was back to her post-POTS recovery and had increased the demand of her activities of daily living. Tr. 661. She had good progress and motivation in a busy life. Tr. 661. In March 2020, Plaintiff reported that she had just gotten back from Canada. Tr. 679. She did "pretty well" physically. Tr. 679. She was getting good at walking. Tr. 679. Her goal was to be able to walk in Disneyland in October. Tr. 679. She reported ongoing pelvic floor issues that limited her ability to lift. Tr. 680.

Plaintiff took a break from physical therapy after the pandemic began. Tr. 28, 72. She testified, "That first year, it was like I'm not going to do anything unless it's like ER. Like, I just didn't go anywhere." Tr. 72. The ALJ noted that Plaintiff requested telemedicine visits in 2021 and concluded, "Given the claimant requested telemedicine PT visits in 2021, it is reasonable that she could have requested those visits in 2020 if her symptoms and functioning were as debilitating as alleged." Tr. 29. The ALJ correctly noted that Plaintiff reported in April 2021 that she was going to reconnect with her therapist. Tr. 29, 1321.

Plaintiff restarted physical therapy in June 2021, when she was approved for 11 visits. Tr. 1338. At her first session, the physical therapist wrote that Plaintiff "[h]as mostly recovered from POTS now." Tr. 1344. Plaintiff had started breath biofeedback therapy. Tr. 1344. She was "a

good skilled candidate to support optimal function." Tr. 1344. Plaintiff attended a breath biofeedback appointment in July 2021. Tr. 1305. She reported her exercise had improved, and that her heart rate was never above 100 during activity anymore. Tr. 1305. She could lift some pots of water, but "[l]ifting a watermelon was still hard." Tr. 1305. Plaintiff reported subjective improvement in fatigue. Tr. 1306. She had a good response to treatment. Tr. 1306.

Plaintiff argues that the ALJ ignored evidence that she continued to report fatigue. Pl. Op. Br. 8-9 (citing Tr. 1069, 1016, 1073). Plaintiff's first citation is to a problem list that includes fatigue but no narrative explanation. Tr. 1069. Plaintiff's next citation is to a November 2019 office visit note from her gynecologist that states that Plaintiff "continues to have severe fatigue which has inhibited her ability to work." Tr. 1016. The same note states that Plaintiff still felt her luteal phase symptoms, but they were improved. Tr. 1016. Plaintiff also points to a June 2020 visit note stating that Plaintiff "suddenly felt the need to lay down" after pulling weeds. Tr. 1073. The November 2019 visit note came shortly after Plaintiff began taking Mircette and resumed physical therapy, and her June 2020 visit note came during the time Plaintiff took a break from physical therapy. These records reasonably support the ALJ's conclusion that Plaintiff did better when she had physical therapy and worsened when she did not go to physical therapy.

Plaintiff also argues that her physical therapy attendance is not relevant to her fatigue, only to her orthopedic limitations. Pl. Reply 12. But Plaintiff testified that she was lacking stamina, and her physical therapy records contain discussions of Plaintiff's overall energy levels and exercise tolerance. The ALJ correctly stated that the physical therapy records show that Plaintiff's energy and functioning increased with regular visits. Tr. 29. The record supports the ALJ's conclusion that regular physical therapy improved Plaintiff's stamina.

The ALJ correctly noted gaps in Plaintiff's physical therapy attendance. While some may have been due to financial reasons, the record also shows periods in which Plaintiff was authorized but did not attend, and she was discharged for noncompliance in September 2019. The ALJ also reasonably questioned why Plaintiff waited more than a year to restart physical therapy remotely during the pandemic. The record shows that Plaintiff and her providers believed that physical therapy helped her improve her exercise tolerance and reduce fatigue. The ALJ reasonably questioned the gaps in physical therapy to the extent they were not based on financial constraints.

Plaintiff argues that the ALJ erred in relying on her improvement with treatment because she improved from a low baseline. Pl. Op. Br. 7-9. But the record shows that her complaints of fatigue decreased significantly when she attended physical therapy and began taking birth control along with other medications. Her physical therapy records reflect that Plaintiff reached a point where she was doing her activities of daily living with only mild limits and was able to exercise. The records reflect a level of stamina greater than what Plaintiff alleged at the hearing.

Plaintiff objects to Defendant's assertion that the ALJ relied on conservative treatment. Pl. Reply 11 (citing Def. Br. 4). The ALJ did not characterize Plaintiff's treatment as conservative, but he did find that Plaintiff's symptoms improved significantly with treatment. That conclusion was not erroneous. While Plaintiff testified at her hearing that her stamina was worsening over time, the treatment record supports the opposite conclusion.

The ALJ reasonably concluded that Plaintiff's physical therapy and medication regimen, when followed, relieved her symptoms such that she could function within the constraints he placed in the RFC. The ALJ limited Plaintiff to sedentary work and limited her to lifting up to 10 pounds occasionally. Tr. 22. He also restricted her to environments "free of fast-paced

production requirements." Tr. 22. Plaintiff's treatment records support the ALJ's assessment of her level of functioning, and Plaintiff identifies no error in the RFC. Plaintiff's course of treatment is substantial evidence supporting the ALJ's assessment of her stamina and fatigue.

C.    Effects of Mold

The ALJ attributed some of Plaintiff's POTS symptoms to mold. Tr. 29. He noted that in September 2019, Plaintiff reported feeling better in Canada away from her moldy house, that her allergy records note a mold allergy, and that her physical therapist noted that Plaintiff "was 'pretty sure she has mold toxicity.'" Tr. 29. In September 2019, Plaintiff told an allergist that she suspected that mold aggravated her symptoms. Tr. 399. She reported that she felt better in Canada. Tr. 399. Later that month, she told Dr. Guggenheim that she was "living in a moldy house" with "visible mold in the attic." Tr. 787. She reported that her symptoms improved when she was in Canada and worsened when she came home. Tr. 787.

The Court did not find any Ninth Circuit cases addressing a mold allergy, but courts in other circuits have treated a mold allergy as a medically determinable impairment. *See Brown v. Shalala*, 15 F.3d 97, 99 (8th Cir. 1994) (mold allergy was claimant's only medically determinable impairment); *Freels v. Astrue*, 772 F. Supp. 2d 608, 620 (D. Del. 2011) (ALJ found that "immune response gene segregation disequilibrium confirmed by presence of the 'mold susceptible' haplotype 11–3–52B" was one of Plaintiff's severe impairments).

Plaintiff states that to the extent the ALJ's reasoning can be understood, it appears to support her testimony that she lacks stamina. Pl. Op. Br. 9. The problem with Plaintiff's argument is that a mold allergy is not one of her medically determinable impairments, either severe or non-severe. Tr. 21-22. Plaintiff did not allege disability based on a mold allergy. The ALJ found evidence in the record that Plaintiff has a mold allergy and that it contributed to her

symptoms. In other words, although the ALJ found that POTS and EDS—the conditions on which Plaintiff relies in arguing that she is disabled—could be expected to cause her symptoms, those symptoms were partially caused by exposure to mold. This supports the conclusion that Plaintiff's POTS and EDS are not disabling because they cause a lesser degree of symptoms than Plaintiff alleged. And even if the ALJ erred in relying on Plaintiff's mold allergy, the error was harmless because he properly relied on Plaintiff's activities and course of treatment in finding that she had less fatigue and more stamina than she alleged. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1163 (9th Cir. 2008) (holding that the ALJ's erroneous reliance on some reasons for discounting claimant's testimony was harmless because the ALJ also relied on valid reasons to discount that testimony).

      D.      Objective Medical Record

      An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (holding that "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ

may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022).

      The ALJ noted some abnormal findings in Plaintiff's physical examinations that were consistent with her severe impairments. Tr. 25. Relevant here, he noted "lower extremity weakness," low ferritin levels, and high cortisol levels. Tr. 25. The ALJ also noted many normal objective findings:

> [N]ormal strength in the upper and lower extremities, good muscle mass and tone, normal pedal pulses bilaterally, normal mental status examination findings despite complaints of anxiety, normal gait, normal cardiac rate, rhythm and sounds, normal respiratory signs, normal/nonhyperextensible skin, no acute distress, normal blood pressure, no edema, grossly intact cranial nerves, intact sensations, and normal gynecological examination findings.

Tr. 25 (citations omitted). He also noted that Plaintiff "denied dizziness, syncope, headaches, weakness, numbness, dysphoric mood, anxiety, nervousness, sleep disturbance, shortness of breath, chest pains, and palpitations." Tr. 25.

      The findings that Plaintiff had a normal cardiac rate, rhythm, and sounds; normal respiratory signs; normal blood pressure; and a lack of shortness of breath, chest pains, or palpitations, support the ALJ's conclusion that her POTS improved significantly. To the extent that Plaintiff relies on her EDS, a connective tissue condition, as a cause of her fatigue, the normal findings related to skin support the ALJ's conclusion that her EDS was less limiting than she alleged. The normal findings related to strength, muscle mass and tone, and gait support the conclusion that Plaintiff has more stamina than she alleged. Plaintiff's denial of dizziness, syncope, and weakness support the ALJ's finding that her post-prandial symptoms and fatigue improved.

      Defendant also argues that the normal objective findings undermine Plaintiff's testimony "that she could stand for about five minutes, and walk for 1/8 of a mile." Def. Br. 4. Plaintiff

argues that the ALJ addressed Plaintiff's "medical signs as evidence of capacity, not credibility[.]" Pl. Reply 10. But the ALJ stated that the normal objective findings "do not support the claimant's allegations of debilitating functional limitations[.]" Tr. 25. Plaintiff also argues that she did not allege that she could stand for only five minutes or walk only 1/8 of a mile. Pl. Reply 10. Plaintiff testified at her hearing that she did not "do well with standing" and could tolerate it "for about five minutes." Tr. 80. She testified that she had "worked up to" walking 1/8 of a mile to her mailbox and would need a break after doing so. Tr. 81. The ALJ noted this testimony, but it is not clear that he specifically discounted it. *See* Tr. 23. To the extent he did discount the testimony, he did not err. The record supports the ALJ's conclusion that Plaintiff's stamina was greater than she alleged and her fatigue was less than she alleged.

The ALJ thoroughly considered the record in a detailed decision addressing Plaintiff's testimony and the medical evidence. He did not err in discounting Plaintiff's testimony about her stamina and fatigue. Substantial evidence supports his conclusion that Plaintiff is not disabled.

## CONCLUSION

Based on the foregoing, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED: _____March 15, 2024_____.


_____
MARCO A. HERNANDEZ
United States District Judge